IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LESTER A.D. ADAMS, *et al.*

                              Civil Action No. DKC 2005-3332

CHRISTOPHER A. BROOKS

**MEMORANDUM OPINION**

Both Lester A.D. Adams and Dr. Christopher A. Brooks claim to own the residential property located at 3711 Kennedy Street in Hyattsville, Maryland ("the Property"). Record title is in the name of Dr. Brooks, but Mr. Adams asserts that Dr. Brooks holds that title in trust for him. Co-plaintiff Maribel F. Murray, who occupies the Property, claims that she was granted an option to purchase the Property as part of a lease agreement. She seeks to require Dr. Brooks to sell the Property to her. The history of this dispute reads like a novel, but unfortunately is all too real. What was once a close friendship has deteriorated into a legal morass. After a one day bench trial, some of the equitable claims are ready for resolution.

**I. Findings of Fact**

After hearing the testimony of Dr. Brooks, Mr. Adams, and Ms. Murray and considering all of the documentary evidence presented at the July 10, 2007 bench trial, the court makes the following findings of fact.

Dr. Brooks holds a Ph.D. in anthropology, and is a professor at Virginia Commonwealth University in Richmond, Virginia. Mr. Adams was a practicing lawyer licensed in the state of Maryland between 1992 and 1998.[1] Prior to the events at issue in this case, Dr. Brooks and Mr. Adams were longtime friends. The two met while they were students at the University of Maryland in approximately 1975, and maintained more or less regular communication until 1999. Each served as best man at the other's wedding. Mr. Adams represented Dr. Brooks in two legal matters in the state of Maryland, including a divorce.[2]

Ms. Murray and Mr. Adams are the parents of a minor daughter. Ms. Murray has resided at the Property since approximately the time it was purchased in 1999 with her two daughters. Mr. Adams resides in Mount Rainier, Maryland. Dr. Brooks was familiar with Mr. Adams's personal affairs, including his relationship with Ms. Murray and the fact that they have a daughter. In June 1999, Mr. Adams and Ms. Murray visited Dr. Brooks at his home in Richmond. Shortly thereafter, Mr. Adams suggested that Dr. Brooks become

---

[1] Mr. Adams was suspended from the practice of law in Maryland by the Maryland Court of Appeals in 1998. Initially, he was subject to a thirty-day suspension. An indefinite suspension was subsequently imposed by consent.

[2] Dr. Brooks testified that he paid Mr. Adams a fee in exchange for these legal services, while Mr. Adams testified that he provided the services to Dr. Brooks at no charge. This factual dispute is immaterial to the issues presented in this cases, and need not be resolved.

involved in purchasing the Property.  At that time, the Property
was uninhabited, and was in the possession of the United States
Department of Veterans Affairs.   Dr. Brooks had recently been
selected to receive a senior Fulbright fellowship to conduct field
research   in   southern   Africa,   and   was   planning   to   spend
approximately a year abroad conducting this research.   Dr. Brooks
expressed to Mr. Adams his concern that the proceeds of the
fellowship would constitute income for purposes of Dr. Brooks's
income taxes.  Mr. Adams suggested that Dr. Brooks could purchase
the Property as an investment, in an attempt to claim income tax
deductions to offset some of the additional income associated with
the fellowship proceeds.[3]   Mr. Adams explained that it would be
possible to arrange a purchase of the Property without any cash
investment by Dr. Brooks, by purchasing the Property through Dr.
Brooks's credit and paying the mortgage and associated expenses by
renting the Property to a tenant.  Mr. Adams also told Dr. Brooks
that he had already located a tenant who was willing to lease the
Property.   Dr. Brooks agreed to this arrangement, and Mr. Adams
agreed to assist Dr. Brooks in obtaining financing to purchase the
Property.

---

[3] The findings of fact regarding this discussion and the
agreements reached between Dr. Brooks and Mr. Adams are based on
the testimony of Dr. Brooks.   Mr. Adams presented conflicting
testimony as described more fully below.  For the reasons stated
below, the court finds Dr. Brooks's testimony in this regard to be
more credible than the testimony provided by Mr. Adams.

Without Dr. Brooks's knowledge, Mr. Adams caused a real estate agent to execute an "Offer to Purchase and Contract of Sale" and provide it to the Department of Veterans Affairs. (Ex. 1). The contract set the offered price of the Property at $87,000, and included no down payment. The earnest money provided for in the contract was $870.00. The contract purported to have been signed by both Dr. Brooks and the real estate agent, Alethia Covington, on July 7, 1999. Mr. Adams remembered that it may have been executed some other day, but could not recall when. The contract included a signature purporting to be that of Dr. Brooks, but Dr. Brooks did not sign the form and was not aware during the summer of 1999 that an offer to purchase the Property had been made in his name. Dr. Brooks also did not tell Mr. Adams that he was authorized to make such a contract on Dr. Brooks's behalf, nor did he sign a power of attorney or any other document authorizing Mr. Adams to contract on his behalf to acquire the Property. The offer to purchase and contract of sale also included an address and two telephone numbers purportedly for Dr. Brooks, but the contact information listed was Mr. Adams's home address, his home telephone number, and a telephone number that he had been using for business purposes. Mr. Adams acknowledged that he instructed the broker who was assisting him with the financing to use this contact information.

Although the exact date is not clear, at some point in the summer of 1999, Dr. Brooks came to Hyattsville, Maryland, and Mr.

Adams led him and Ms. Murray on a tour of the Property.  Sometime in July 1999, Dr. Brooks talked to Mr. Adams by telephone, and provided financial information to include in an application for a residential mortgage.  Dr. Brooks then received a packet of documents including a mortgage application from Mr. Adams, which Mr. Adams directed Dr. Brooks to sign.  Each of these documents was already filled out when Dr. Brooks received them, including the mortgage application, which was completed with the information that Dr. Brooks had provided to Mr. Adams by telephone.  Dr. Brooks signed the documents on July 29, 1999, and returned them to Mr. Adams by overnight mail.

The precise contents of this packet of documents was not established at the trial, but some facts are clear.  Dr. Brooks acknowledged he signed a "Maryland First-Time Home Buyer Statement," along with the other documents that he dated July 29, 1999.  (Ex. 3, at 3-1).  Mr. Adams subsequently notarized this signature, and his notary certification was also dated July 29, 1999.  (*Id.*).  Dr. Brooks also acknowledged that he signed a "Request for Verification of Employment" (Ex. 3, at 3-2) and an "Authorization for Release" (Ex. 3, at 3-5), both of which were dated July 29, 1999.  A copy of the Offer to Purchase and Contract for Sale, dated July 7, 1999, was also included as a part of Exhibit 3 at the bench trial.  (Ex. 3, at 3-3).  Dr. Brooks testified that this document was not a part of the packet of

documents sent to him by Mr. Adams, and the court concludes that it was not.  Two other documents, relating to lead paint disclosure, are also included in Exhibit 3, purport to bear the signature of Dr. Brooks, and purport to have been executed on July 29, 1999, but no further testimony about these documents was presented.

After returning the loan documents to Mr. Adams, Dr. Brooks made several attempts to contact Mr. Adams about the purchase of the Property and the status of his loan application.  Dr. Brooks left telephone messages for Mr. Adams, but did not receive any return calls, or any other contact from Mr. Adams.  At the same time Dr. Brooks was preparing to leave the country for southern Africa to conduct the field research related to his Fulbright fellowship.  Because he was unable to contact Mr. Adams, and because as far as he knew there had been no purchase contract, no mortgage approval, and no settlement, Dr. Brooks concluded that the purchase of the Property had fallen through.  Dr. Brooks did not tell Mr. Adams that he had the authority to complete the purchase of the Property on Dr. Brooks's behalf.  Dr. Brooks left the country to conduct field research in September 1999.  He returned to his home in Richmond briefly in December 1999.  He traveled back to southern Africa in January 2000 and returned home in May 2000.

Meanwhile, Mr. Adams, without Dr. Brooks's knowledge or consent, completed the transaction to acquire legal title to the Property and to establish a mortgage, both in Dr. Brooks's name.

6

There was no in-person settlement for the transaction, unlike the customary practice in real estate transactions between private parties, because a government agency, the Department of Veterans Affairs, was the seller.  Instead, Mr. Adams acknowledges that he signed Dr. Brooks's name to a United States Department of Housing and Urban Development Settlement Statement form dated September 17, 1999.  (Ex. 4, at 4-2).  This statement indicates that no down payment was made on the Property, but various fees and costs totaling $4352.46 were paid by Mr. Adams at settlement, and the purchase price of $87,000 was borrowed in Dr. Brooks's name to fund the purchase.

Mr. Adams also acknowledges that he executed a "Purchase Money Deed of Trust" in Dr. Brooks's name, binding Dr. Brooks to a mortgage on the Property for the $87,000 purchase price.[4]  The deed of trust establishes a fixed 7.25% interest rate for the 30 year mortgage, resulting in monthly principal and interest payments of $593.49 through October 2029.  The deed of trust is dated September 17, 1999.  Mr. Adams acknowledged that he signed Dr. Brooks's name to this document, and then signed his own name to notarize the purported signature of Dr. Brooks.  Mr. Adams also executed a "Deed of Trust Note" in Dr. Brooks's name dated September 17, 1999, which describes the terms of the mortgage in greater detail.  (Ex. 22).

[4] A partial copy of the deed of trust was introduced by Mr. Adams as Exhibit 5 at the trial.  A complete copy of the same document was later introduced by Dr. Brooks as Exhibit 23.

Mr. Adams also signed Dr. Brooks's name to this document and notarized the purported signature of Dr. Brooks.

A lease agreement dated August 2, 1999, prepared by Mr. Adams, purports to lease the Property to Ms. Murray.   Under this lease agreement (Ex. 8), Ms. Murray leased the Property beginning on August 15, 1999, for a term of one year, which was to roll over to a month to month lease after the term of one year.   The monthly rent payments required under the lease agreement were $800, which was approximately equal to the total mortgage payment, including sums collected to pay property taxes and insurance at that time. The lease agreement bears a signature purporting to be that of Dr. Brooks, with the initials LAA below it.   Dr. Brooks testified that he did not sign and was not aware of the lease agreement.   Mr. Adams testified that he executed the lease agreement by signing his own name and Dr. Brooks's name.   He also testified that his primary purpose in executing the lease was to allow Ms. Murray to establish utility accounts at the Property, because no utilities were activated at the time the Property was purchased.[5]   Pursuant to the lease agreement, Ms. Murray began living at the Property in 1999, and generally made payments under the lease agreement to Mr. Adams, who typically made the mortgage payments.

---

[5] Dr. Brooks testified that his credit report once indicated a balance due on a utility bill related to the Property, arguing that utility bills may have been set up in his name or somehow linked to his credit.

8

The Property had not been inhabited for some time when Ms. Murray took possession of it, and she invested approximately $15,000 to $20,000 in addition to many hours of her own labor to improve the condition of the Property so that she and her daughters could move in.   She also testified that she continued making improvements to the Property.   In total, Ms. Murray testified that she has spent approximately $55,000 to $60,0000 to improve the Property.   Ms. Murray testified that she made these improvements only because she expected to become the owner of the Property.

Mr. Adams testified that mortgage payments for the Property fell behind in 2001, and a foreclosure action was either threatened or initiated.   Mr. Adams ultimately made payments to the mortgage servicing company that brought the mortgage payments out of default, and the foreclosure proceedings were terminated.   Mr. Adams testified that this incident occurred sometime before August 14, 2001, when he and Ms. Murray executed an addendum to the lease agreement.   (Ex. 9).   The lease addendum extended the lease to August 14, 2006, and included an option under which Ms. Murray could purchase the Property, at any time before August 14, 2006, at the price of $100,000 less a credit for five percent of the rental payments Ms. Murray had made.   Mr. Adams executed the lease addendum by signing Dr. Brooks's name, followed by the initials LAA and signing his own name on the next line, identifying himself as "Agent[.]"

Upon his return to the United States at the completion of his field research in May 2000, Dr. Brooks did not know that the Property had been purchased in his name, nor did he know that the lease agreement had been executed.  Dr. Brooks had no contact with Mr. Adams, and did not learn anything more with respect to the Property until he attempted to refinance his home, in Richmond, Virginia, in December 2001.  At that time, Dr. Brooks was advised that his credit report indicated that he was the owner of the Property, and that the Property was subject to foreclosure proceedings.  Dr. Brooks began notifying authorities that he believed his identity had been stolen and that the mortgage relating to the Property had been acquired without his knowledge or consent.  He attempted to clear the mortgage from his credit report and to disassociate himself from the Property.

Dr. Brooks notified the servicer of the mortgage, Countrywide Home Loans, Incorporated ("Countrywide"), by telephone on December 13, 2001, that the purchase of the Property had been conducted without his consent.  Countrywide faxed Dr. Brooks documents including a fraud declaration (Ex. 12, at 12-4), which Dr. Brooks completed and signed on December 14, 2001.  Dr. Brooks also contacted the Federal Trade Commission, the Hyattsville, Maryland Police Department, and the Commonwealth Attorney for Henrico County, Virginia about the mortgage acquired in his name without his permission.  On June 12, 2002, Ms. Vilven Nolan, Assistant Vice

10

President of Countrywide, notified Dr. Brooks by email that she was faxing him the documents from Countrywide's loan origination file, including the

> Settlement Statement[,] Maryland First Time Home Buyer Statement[,] Maryland Standard Single Family Dwelling Lease[,] Request for Verification of Employment[,] Offer to Purchase and Contract of Sale[,] Deed of Trust Note[,] Authorization for Release[,] Preliminary Truth in Lending[,] Notice of Possible Lead-Based Paint[, and] Acknowledgment of receipt of "Protect Your Family From Lead In Your Home."[6]

(Ex. 12, at 12-8). Dr. Brooks first saw and first learned of the Deed of Trust Note and the lease agreement when he received these documents from Countrywide.  The copy of the lease agreement provided to Dr. Brooks by Countrywide did not include the August 14, 2001 lease addendum, and Dr. Brooks did not become aware of the lease addendum until Ms. Murray attempted to exercise the option contained therein, at about the same time Dr. Brooks initiated this litigation in 2005.

After requesting more documents, Countrywide ultimately forwarded Dr. Brooks's documents to the Department of Veterans Affairs and its Inspector General.  The Department of Veterans affairs concluded, according to Dr. Brooks's undisputed testimony

---

[6] Mr. Adams testified that he had never provided Countrywide with a copy of the lease agreement.  Without concluding how Countrywide came to possess a copy of the lease agreement, the court credits Dr. Brooks's testimony that he first saw the lease agreement when he received it from Countrywide, and concludes that this occurred on or about June 12, 2002. (*See* Ex. 12, at 12-8).

at the bench trial, that the evidence was inconclusive as to whether Dr. Brooks was aware of and had consented to the mortgage. Accordingly, it refused to remove his name from the mortgage. Dr. Brooks filed a final report of his identity theft allegations with the Attorney Grievance Commission of Maryland on June 30, 2003, alleging that Mr. Adams had completed the transaction without Dr. Brooks's knowledge or consent. Dr. Brooks received a return letter from the Attorney Grievance Commission, dated August 18, 2003, stating that because Mr. Adams was indefinitely suspended from the practice of law in Maryland, no action would be taken to investigate Dr. Brooks's complaint. (Ex. 13, at 13-5).

At this point, Dr. Brooks concluded that he would not be able to disassociate himself from the Property or remove the mortgage from his credit report. He testified that he consulted a realtor who informed him that he could sell the Property in order to pay off the mortgage. Dr. Brooks took no action at the time to contact Mr. Adams or Ms. Murray to either assert his interest in the Property or to request that they refinance the Property to remove his name from the mortgage. Instead, he simply monitored the mortgage payments and took no other action until 2005.

Mr. Adams testified that he tried to contact Dr. Brooks in 2001 to see how his trip to Africa had gone, but Dr. Brooks indicated that he was unaware of these attempts to make contact. Mr. Adams tried to call and email Dr. Brooks again in March 2003.

Dr. Brooks testified that he was aware that Mr. Adams was attempting to contact him, but that he did not answer Mr. Adams's calls or return his messages because he was angry that the Property had been purchased in his name without his permission and he did not want to speak with Mr. Adams.  Mr. Adams called Dr. Brooks from a number that Dr. Brooks did not recognize and spoke briefly with Dr. Brooks.  Dr. Brooks ended the conversation when he concluded that Mr. Adams was trying to discourage him from taking certain actions, including asserting the legal claims that eventually prompted this litigation.[7]

Dr. Brooks decided in 2005 that he would sell the Property, and retained counsel to assert his rights to the Property.  Dr. Brooks made some mortgage payments in 2005, and has been at least partially reimbursed.  Dr. Brooks's attorney sent a letter, dated July 25, 2005, to Ms. Murray, at the Property, advising her that Dr. Brooks is the record owner of the Property and directing her to send all future correspondence regarding the Property, and her rent payments, to Dr. Brooks, at his address in Richmond, Virginia. (Ex. 14).  Dr. Brooks received no response to this letter, and did not start receiving rent payments at his home.  Dr. Brooks's attorney sent a second letter to Ms. Murray dated August 19, 2005, indicating again that Dr. Brooks owned the Property and notifying

---

[7] Mr. Adams testified that he did not know about Dr. Brooks's identity theft complaints at this time.

Ms. Murray that Dr. Brooks terminated her lease of the Property effective on September 30, 2005, and requesting that Ms. Murray vacate the Property as of that date.   The August 19 letter also asked Ms. Murray to communicate with Dr. Brooks's attorney immediately "[i]f for any reason you believe you are entitled to remain in the property beyond September 30, 2005 . . . ."   (Ex. 15).   Dr. Brooks indicates that he intended this letter to terminate the month to month provisions of the original lease agreement dated August 2, 1999.   Dr. Brooks was not aware of the existence of the lease addendum at this time.

Ms. Murray sent a letter to Dr. Brooks at his home in Richmond dated September 22, 2005, stating:

> As provided for in the addendum to my lease, I intend to exercise my right to purchase under the lease agreement.  I am in the process of securing the loan necessary to complete the transaction.  Since my lease terminates in August, 2006, I intend to continue occupying the premises until that time or until the completion of the purchase whichever is sooner.. [sic]

(Ex. 16).  Dr. Brooks initiated an action in the District Court of Maryland for Prince George's County, Maryland to oust Ms. Murray from the Property as a holdover tenant.   Subsequently, Ms. Murray and Mr. Adams filed the actions at issue in this case, both of which Dr. Brooks removed to this court on December 13, 2005.  As reflected by an Order of the state district court, Dr. Brooks's action to oust Ms. Murray has been stayed, at her request, pending

the outcome of this litigation. (Ex. 21).   The district court's Order also provided an interim arrangement whereby Ms. Murray is responsible for making the monthly mortgage payments on the Property in lieu of posting a bond during the stay.

In making the foregoing factual findings, the court rejects Mr. Adams' contradictory testimony.   For instance, he testified that Dr. Brooks was aware that the purpose of purchasing the Property was to provide housing for Ms. Murray and that Dr. Brooks agreed to hold legal title to the Property but that beneficial ownership would go to Mr. Adams for the benefit of Ms. Murray and their daughter.   He also testified that Dr. Brooks agreed to lend his credit to the transaction so long as he incurred no financial obligation.   He denied discussing whether the Property would be an investment for Dr. Brooks, because the purpose had always been to benefit Ms. Murray and their daughter.   Finally, Mr. Adams testified that Dr. Brooks was aware that the purchase was going forward before he left for southern Africa.   Because the settlement did not occur as expected, Dr. Brooks purportedly told Mr. Adams to take whatever actions were necessary on his behalf to complete the transaction and purchase the Property in Dr. Brooks's name.   None of that testimony is credible.

The record in this case contains ample evidence that Mr. Adams engaged in deceptive conduct that calls into question his credibility, especially in light of his legal training and his

former status as a practicing Maryland lawyer.  Mr. Adams admits that he signed Dr. Brooks's name to the deed of trust and the deed of trust note and then notarized those signatures by signing his own name.  Although less serious, Mr. Adams also notarized Dr. Brooks's genuine signature on the first time home buyer declaration, even though he had not seen Dr. Brooks sign the paper, and placed an incorrect date on the notary certification.[8]  When Mr. Adams filed for bankruptcy in 2000, he was instructed to list any interest in real property, and any interest in real property held in the name of another individual that Mr. Adams held or controlled.  Despite the fact that he claims that he always held a beneficial interest in the Property, he did not declare any interest in the Property on his bankruptcy schedules. (Ex. 19, at 19-8, 19-11).  As a former attorney, Mr. Adams knew how to prepare a written power of attorney.  His claim, that he received and acted upon an oral authorization to complete a real estate transaction by signing the principal's name and then notarizing that signature without a written power of attorney, is simply incredible.

Mr. Adams's testimony was also sometimes inconsistent with the documentary evidence, and even with other aspects of his own testimony.  Mr. Adams testified and reiterated several times that

---

[8] Dr. Brooks signed the loan documents on July 29, 1999, and then returned them to Mr. Adams by overnight mail, as stated above. Accordingly, there is no possibility that Mr. Adams affixed his notary seal to the document on the same date, yet he dated his notary seal July 29, 1999.

he did not send the loan application documents to Dr. Brooks, but
that the broker sent the documents directly to Dr. Brooks and that
Dr. Brooks returned the documents directly to the broker.  When Mr.
Adams was asked how he was able to notarize Dr. Brooks's signature,
if the documents were returned directly to the broker, Mr. Adams
stated that he now remembered that the broker had questioned the
authenticity of Dr. Brooks's signature after receiving the
documents and sent the documents to Mr. Adams to have him confirm
Dr. Brooks's signature and notarize the documents.  It was apparent
that Mr. Adams made up that story out of whole cloth while on the
witness stand.

   Mr. Adams and Ms. Murray argued that Dr. Brooks's testimony
was not credible, in significant part based on the Maryland first
time home buyer form that he has acknowledged signing on July 29,
1999.  This form required Dr. Brooks to affirm that "the above
residence will be occupied by us [sic] as our [sic] principal
residence." (Ex. 3, at 3-1).  At the time he signed the form, Dr.
Brooks knew the Property, if purchased, would be leased to a tenant
and held for investment purposes, not as his principal residence.
Ms. Murray and Mr. Adams argue that Dr. Brooks thus signed the
document under false pretenses, and that this act draws his
credibility into question.  This argument, however, is unavailing.
Dr. Brooks's testimony that he received these documents from Mr.
Adams with instructions to sign them was credible, and at least

17

more credible than Mr. Adams's conflicting testimony.  Accepting
this testimony as true, Mr. Adams bears at least as much
responsibility for this falsehood.  Mr. Adams arranged the
financing and was well aware that Dr. Brooks did not intend to live
in the Property.  Any question this conduct raises with respect to
the credibility of Dr. Brooks's testimony pales in comparison to
the reasons to doubt the credibility of Mr. Adams's testimony.

## II.   Quiet Title

Mr. Adams brought this action, in the Circuit Court for Prince
George's County, seeking to quiet title to the Property.[9]  Mr.
Adams acknowledges that Dr. Brooks is the record owner of the
Property, but alleges that a trust should be implied for his

---

[9] An action to quiet title is available, under Maryland law,
pursuant to Md. Code Ann., Real Prop. § 14-108(a), which provides:
> Any person in actual peaceable possession of
> property, or, if the property is vacant and
> unoccupied, in constructive and peaceable
> possession of it, either under color of title
> or claim of right by reason of his or his
> predecessor's adverse possession for the
> statutory period, when his title to the
> property is denied or disputed, or when any
> other person claims, of record or otherwise to
> own the property, or any part of it, or to
> hold any lien encumbrance on it, regardless of
> whether or not the hostile outstanding claim
> is being actively asserted, and if an action
> at law or proceeding in equity is not pending
> to enforce or test the validity of the title,
> lien, encumbrance, or other adverse claim, the
> person may maintain a suit in equity in the
> county where the property lies to quiet or
> remove any cloud from the title, or determine
> any adverse claim.

benefit.[10]   Mr. Adams argues for a trust under the doctrine of constructive trusts, although it appears that the doctrine of resulting trusts may be more closely applicable to the facts of this case.  Under  these circumstances, it is not entirely clear whether the appropriate action is one to quiet title or for a declaratory judgment as to ownership of the Property, but the distinction is unimportant, because either action invokes the court's equitable powers and would turn on whether any trust in Mr. Adams's favor is implied.

## A.   Constructive Trust

Under Maryland law,

> [a] constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it.  The purpose of the remedy is to prevent the unjust enrichment of the holder of the property.

*Wimmer v. Wimmer*, 287 Md. 663, 668 (1980) (citations omitted) (citing *Bowie v. Ford*, 269 Md. 111, 304 A.2d 803 (1973); *Siemiesz*

---

[10] Dr. Brooks's actions with respect to the Property, including his two letters claiming ownership thereof in 2005 have ratified Mr. Adams's actions in purchasing the property and signing the deed of trust and deed of trust note on Dr. Brooks's behalf. Accordingly, Dr. Brooks takes the position that he now owns the Property and is liable for the outstanding mortgage debt.

*v. Amend*, 237 Md. 438, 206 A.2d 723 (1965); *O'Connor v. Estevez*, 182 Md. 541 (1943).  Although the purpose of a constructive trust is to prevent unjust enrichment of the holder of legal title, some inequitable or fraudulent conduct by that party remains a necessary element for the imposition of a constructive trust.  *From The Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 370 Md. 152, 183 n.23 (2002) ("An essential element of constructive trusts is fraud." (citing *Eisinger Mill & Lumber Co. v. Dillon*, 159 Md. 185, 191 (1930))), *cert. denied*, 537 U.S. 1171 (2003); *see also Jahnigen v. Smith*, 143 Md.App. 547, 557 ("The facts as presented do not support an action for a constructive trust because there has been no allegation of misrepresentation, fraud, or other improper methods of obtaining title."), *cert. denied*, 369 Md. 660 (2002).

The party asserting a constructive trust bears the burden to prove the circumstances supporting imposition of the trust by clear and convincing evidence: "[i]n the ordinary case, there must be clear and convincing evidence not only of wrongdoing, but also of the circumstances which render it inequitable for the holder of the legal title to retain the beneficial interest." *Wimmer*, 287 Md. at 668.  This showing is relaxed, however, when there is a confidential relationship in which the holder of legal title is the dominant party.  Such a relationship must be proven by clear and convincing evidence.  *Id.* at 668-69 (citing *Fant v. Duffy*, 232 Md. 481 (1963); *Bell v. Bell*, 38 Md.App. 10 (1977)).  A showing that a

confidential relationship exists "shifts the burden to the defendant to show the fairness and reasonableness of the transaction. The defendant's evidence must be clear, satisfactory, and convincing to overcome the presumption." *Id.* at 669 (citations omitted) (citing *Sanders v. Sanders*, 261 Md. 268, 276 (1971); *Rice v. Rice*, 184 Md. 403, 411-12 (1945)). Maryland courts have imposed a constructive trust after the party upon whom the trust is imposed breached "some parol agreement whereby [that] party acquired and then inequitably held property resulting in his unjust enrichment[,]" on the theory that the parol trust agreement constitutes a confidential relationship that is breached when the party holding legal title refuses to honor the parol trust agreement. *Id.* at 669-70 (citing cases).

Mr. Adams cannot prevail on a theory of constructive trust, because there has been no proof that Dr. Brooks engaged in "misrepresentation, fraud, or other improper methods of obtaining title." *Jahnigen*, 143 Md.App. at 557. Mr. Adams' argument in favor of a constructive trust depends on his allegation that Dr. Brooks orally agreed to hold title to the Property for the benefit of Mr. Adams in order to provide housing for Ms. Murray and their daughter. Thus, Mr. Adams argues that the facts in this case were similar to the facts of *Dove v. White*, 211 Md. 228 (1956), which imposed a constructive trust based on breach of a confidential relationship in the form of an oral trust agreement. In *Dove*, the

21

holder of legal title conceded that she had agreed orally to hold title to residential real property although the beneficial owners were really to be two married individuals estranged from their respective spouses. *Id.* at 231. The *Dove* court imposed a constructive trust when the title holder refused to honor this oral arrangement and instead handed the house over to one of the two beneficial owners. *Id.* at 248.

Unlike the facts in *Dove*, the court finds that there was no agreement by Dr. Brooks to hold title to the Property as a trustee for the benefit of Mr. Adams and Ms. Murray.  Instead, the court finds that Dr. Brooks did not know that Ms. Murray was to reside at the Property, or that the Property had been purchased, at the time title to the Property was acquired in his name.  Plaintiff alleges no other basis to conclude that any confidential relationship existed with Dr. Brooks as the dominant party.  Accordingly, there was no fraud or other inequitable conduct that could serve as the basis for the imposition of a constructive trust.

## B.  Resulting Trust

Although Mr. Adams has not addressed the issue of a resulting trust, the Court of Special Appeals of Maryland has recently indicated that this doctrine is properly applied to a case, such as this one, where allegations in favor of a constructive trust fall short, but a plaintiff has provided a down-payment for the purchase of real property.  In *Jahnigen*, the court concluded that a

resulting trust was the proper framework to analyze a claim that a
tenant was the beneficial owner of a part of a property legally
titled in the landlord's name because the tenant had provided part
of the down payment.  *Jahnigen*, 143 Md.App. at 557-58.

> A resulting trust is an implied trust
> which rests upon the presumed intention of the
> parties.  It may arise when the consideration
> given for a property is furnished by one party
> while the legal title is taken by another,
> provided the circumstances surrounding the
> transaction do not demonstrate a contrary
> intention by the parties.  *Taylor v.*
> *Mercantile-Safe Deposit & Trust Co.*, 269 Md.
> 531, 307 A.2d 670 (1973); *Fitch v. Double "U"*
> *Sales Corp.*, 212 Md. 324, 129 A.2d 93 (1957);
> *Fasman v. Pottashnick*, 188 Md. 105, 51 A.2d
> 664 (1947).  Where only a portion of the
> consideration is so paid a resulting trust may
> arise in favor of the payor "in such
> proportion as the part paid by him bears to
> the total purchase price, unless he manifests
> an intention that no resulting trust should
> arise or that a resulting trust to that extent
> should not arise."  *Fasman v. Pottashnick,*
> *supra*, at 109, 51 A.2d at 666.
> The party seeking to establish a
> resulting trust has the burden of doing so by
> clear, unequivocal, and convincing evidence.
> *Siemiesz v. Amend*, 237 Md. 438, 206 A.2d 723
> (1965); *Fitch v. Double "U" Sales Corp.,*
> *supra*. Payment of the purchase price by the
> party claiming the benefit of the trust must
> have occurred either before or at the time of
> the purchase and "the transaction is to be
> judged as of its date, and not upon the basis
> of facts occurring subsequent to that date."
> *Lacey v. Van Royen*, 259 Md. 80, 89, 267 A.2d
> 91, 96 (1970).

*Levin v. Levin*, 43 Md.App. 380, 387 (1979).

The Restatement (Third) of Trusts explains an exception under which a court, sitting in equity, has discretion to refrain from imposing a resulting trust.

> (1) Except as stated in Subsection (2), where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid unless
> (a) the latter manifests an intention that no resulting trust should arise, or
> (b) the transfer is made to accomplish an unlawful purpose, in which case a resulting trust does not arise if the policy against unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction.

Restatement (Third) of Trusts, § 9 (2003); *see also* Restatement (Second) of Trusts, § 444 (1959) (describing a similar exception).

In analyzing whether a resulting trust arises in this case, the mortgage payments made by Mr. Adams and Ms. Murray and the improvements to the Property made by Ms. Murray are not relevant, because these events occurred after the date of the transaction that transferred title to the Property to Dr. Brooks. *See Levin*, 43 Md.App. at 387 (quoting *Lacey*, 259 Md. at 89). As described in the findings of fact, Mr. Adams paid closing costs on or prior to the date of the closing in the amount of $4352.46. A partial resulting trust in Mr. Adams's favor is therefore possible.

The transaction whereby Mr. Adams purchased the Property in Dr. Brooks's name was made for illegal purposes, namely to defraud a mortgage company by extending a loan to Mr. Adams based on Dr.

24

Brooks' financial standing, and it would be inequitable to impose a resulting trust over even part of the value of the Property in Mr. Adams's favor.  Dr. Brooks neither knew nor consented to Mr. Adams finalizing the purchase of the Property in September 1999. Moreover,  Mr. Adams made the purchase based on Dr. Brooks's credit and by signing Dr. Brooks's name on the deed of trust and deed of trust note.  It is inconceivable that the same mortgage terms would have been extended to Mr. Adams based on his own credit, considering his lack of significant income at that time, as revealed by his bankruptcy schedules.  (Ex. 19).

The inequity of rewarding Mr. Adams for conducting this fraudulent transaction in Dr. Brooks's name without Dr. Brooks's consent outweighs any inequity of allowing Dr. Brooks to benefit from the value of the closing costs paid by Mr. Adams.  Dr. Brooks has been personally disadvantaged and inconvenienced by Mr. Adams's illegal use of Dr. Brooks's credit to purchase the Property, and is responsible for the remaining years of the mortgage.  Testimony at trial indicated that the lease payments constituted a fair market rent for the premises.  There is no justification for imposing any resulting trust.  Accordingly, no resulting trust in Mr. Adams's favor will be implied.

## III.   Specific Performance

Ms. Murray seeks specific performance of the option to purchase contained in the lease addendum executed by herself and Mr. Adams, purporting to act on behalf of Dr. Brooks.

> Specific performance of a contract is a matter of sound judicial discretion controlled by established principles of equity. In determining whether to grant or withhold relief of this sort, the Court should consider all of the circumstances of the particular case in the light of equitable principles. Initially of course the plaintiff must prove the existence of an agreement between the parties and a breach of that agreement by the defendant.

*Data Consultants, Inc. v. Traywick*, 593 F.Supp. 447, 453 (D.Md. 1983) (citations omitted) (citing *Offutt v. Offutt*, 106 Md. 236 (1907)), *aff'd*, 742 F.2d 1448 (1984) (Unpublished Disposition); *see also Namleb Corp. v. Garrett*, 149 Md.App. 163, 174 (2002) ("Specific performance may be granted in an appropriate case on the basis of the strength of the circumstances and equities of each party." (citing *Zouck v. Zouck*, 204 Md. 285, 296 (1954))), *cert. denied*, 374 Md. 83 (2003).  The findings of fact made above clearly establish that Dr. Brooks did not actually authorize Mr. Adams to negotiate, draft, or execute the lease addendum on his behalf, and did not know at the time that the lease addendum existed.  Ms. Murray contends that Dr. Brooks should nonetheless be bound by the lease addendum, under the doctrines of ratification and apparent authority.

## A. Ratification

"Under the doctrine of ratification, a principal may later approve the actions of an agent who acted without authority." *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 812 (4th Cir. 2001) (citing *Bruffey Contracting Co., Inc. v. Burroughs Corp.*, 522 F.Supp. 769, 774 (D.Md. 1981), *aff'd*, 681 F.2d 812 (4th Cir. 1982)). "Ratification requires an intention to ratify, and knowledge of all material facts." *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md.App. 431, 442 (1986) (citations omitted) (citing *Smith v. Merritt Sav. & Loan, Inc.*, 266 Md. 526, 539 (1972); *Linden Homes Inc. v. Larkin*, 231 Md. 566, 570 (1963); 3 Am.Jur.2d Agency § 189 (1986)); *see also Integrated Consulting Servs., Inc. v. LDDS Commc'ns, Inc.*, 996 F.Supp 470, 476 (D.Md. 1998), *aff'd*, 1999 WL 218740 (4th Cir. April 15, 1999) (Unpublished Disposition). "An '[i]ntention to ratify may be inferred by words, conduct or silence on the part of the principal that reasonably indicates its desire to affirm the unauthorized act.'" *Republic of Rwanda*, 274 F.3d at 812 (quoting *Progressive*, 69 Md.App. at 442).

In this case, Dr. Brooks did not ratify the lease addendum either through his express ratification of the original lease agreement or through subsequent silence, because the element of knowledge is lacking. In order to ratify an unauthorized action by a purported agent, through affirmative acts or through silence, the principal must have knowledge of all material circumstances.

*Progressive*, 69 Md.App. at 442.   As found above, the copy of the lease agreement Dr. Brooks received from Countrywide in 2002 did not include the lease addendum.   Dr. Brooks did not learn of the existence of any lease addendum or any details regarding the content of the lease addendum until he received Ms. Murray's letter, dated September 22, 2005 (Ex. 16), purporting to exercise her purchase option under the lease addendum.   Without knowledge of the existence or basic terms of the lease addendum and the purchase option it contained, Dr. Brooks cannot have ratified the lease addendum, even if he did ratify the original lease agreement.   Dr. Brooks's conduct after September 22, 2005, also does not support any intention to ratify the lease addendum.   At about that time, Dr. Brooks filed an action in the District Court of Maryland for Prince George's County to retake possession of the Property, taking a legal position at odds with the terms of the lease addendum.   Dr. Brooks did not ratify the terms of the lease addendum because his conduct, after he was aware of all material facts about the lease addendum, cannot support an inference of an intent to ratify the lease addendum.

**B.   Apparent Authority and Agency by Estoppel**

Maryland recognizes related doctrines of apparent authority and agency by estoppel.

> Under the doctrine of apparent authority, a
> principal will be bound by the acts of a
> person purporting to act for him where "the
> words or conduct of the principal cause a

> third party to believe that the principal
> consents to or has authorized the conduct of
> the agent." A similar showing is required to
> establish agency by estoppel. "Like apparent
> authority, an agency by estoppel can arise
> only where the principal, through words or
> conduct, represents that the agent has
> authority to act and the third person
> reasonably relies on those representations."

*Integrated Consulting Servs., Inc.*, 1999 WL 218740, at *9 (quoting

*Johns Hopkins Univ. v. Ritter*, 114 Md.App. 77 (1996)). Under

appropriate circumstances, the conduct of the principal upon which

apparent authority or agency by estoppel is based can include

silence, but silence cannot be probative evidence for the third

party in ascertaining the agency relationship absent some evidence

that the principal is aware of the transaction on his behalf. *See

id*. In addition, the doctrine of apparent agency, unlike

ratification and agency by estoppel, depends only on the conduct of

the principal before the contract at issue was executed, "early

enough in a transaction that they may fairly be said to have

'cause[d] the third party to believe that the principal consents to

or has authorized the conduct of the agent.'" *Id*. (quoting *Johns

Hopkins Univ.*, 114 Md.App at 96).

Ms. Murray's assertion of the doctrine of apparent authority

must fail because there is no evidence of any words or conduct by

Dr. Brooks that could form the basis for her belief that he had

authorized Mr. Adams to execute the lease addendum on his behalf at

the time the lease addendum was executed. Ms. Murray contends that

Dr. Brooks's silence after the original lease agreement was executed constituted the basis for her belief that Dr. Brooks consented to Mr. Adams's authority, but this argument fails, because Ms. Murray presented no evidence that she knew or had any reason to suspect that Dr. Brooks was aware of the lease agreement, and the facts proven at the bench trial were that Dr. Brooks did not become aware of the existence of the lease agreement until after the lease addendum had been executed.

With respect to the doctrine of agency by estoppel, Ms. Murray must show that she reasonably relied upon some conduct or words of Dr. Brooks for her conclusion that he acquiesced to Mr. Adams's authority to execute the lease addendum or to the lease addendum. Ms. Murray asserts that she reasonably relied upon Dr. Brooks's letter, dated July 25, 2005, requesting that she send rent payments to his home address in Richmond, and his silence regarding the purchase option and the lease addendum to conclude that Mr. Adams had been authorized to execute the lease addendum. Such reliance, however, is not reasonable. Ms. Murray has presented no basis upon which she could have concluded that Dr. Brooks was aware of the existence of the lease addendum. Dr. Brooks's silence regarding the lease addendum cannot have been probative of his acquiescence to the lease addendum, absent some basis for concluding that he was aware of its existence. Likewise, Dr. Brooks's ratification of the original lease agreement through his July 25, 2005 letter, in the

absence of any evidence that he was aware of the lease addendum, provides no basis for Ms. Murray to have reasonably relied on Dr. Brooks's acquiescence to the lease agreement. *See Integrated Consulting Servs, Inc.*, 996 F.Supp at 476 (finding no agency by estoppel when the third party had no evidence to suggest that the purported principal had knowledge of the transaction).

## IV.  Conclusion

Since 1999, Ms. Murray and her family have lived in the Property, fixed it up and maintained it, and made monthly payments to cover the mortgage and related expenses.  The testimony at trial was that the monthly payments constituted a fair market rent for the Property.  Although Ms. Murray may have expected, as of the execution of the lease addendum, that she could eventually purchase the property, she has not paid a premium in rent for that option, nor presented evidence that she was financially able to conclude the purchase.  Mr. Adams has no one to blame but himself that he does not own the Property.  He did, through his wrongful conduct, provide a home for Ms. Murray and their daughter for nearly eight years, but will benefit no more from his actions.  Dr. Brooks, who initially attempted to disassociate himself from the property and mortgage, now recognizes that he owns and is responsible for the property and the mortgage, which runs through October 2029. Accordingly, for the reasons set forth above, Mr. Adams's claim to

quiet title and Ms. Murray's claim for specific performance of the purchase option will be denied.   A separate Order will follow.

                    _____/s/_____
                    DEBORAH K. CHASANOW
                    United States District Judge